Curia, per

Withers, J.
The general outline of the trans *482 action which has given rise to this litigation, presents nothing more, when the evidence is regarded, than the common case of the owners of a parcel of cotton shipping the same, through the instrumentality of another, to consignees, the correspondents of the latter, to be sold by them, at a foreign port, for and on account of the owners ; and an advance to them by the person appearing here as plaintiff, by means of exchange drawn against the proceeds of the cotton when received and sold at the port of destination. It is, therefore, a transaction pertaining to foreign commerce.
Some of the complaints that are made in behalf of defendants have arisen from that unhappy course of trade which has allowed New York to become an intermediate toll-house for the exports and imports of Charleston to and from foreign ports. The cotton was sent to New York, and charges incurred, of course ; it was thence transhipped for Bremen, with attendant charges accumulated. The advance of cash obtained here from ¡the plaintiff was made by a bill, not directly on the house of the consignees at Bremen, (as would appear from the brief) but by a bill on a house in New York, which bill was met, that is, the money was raised upon it, by another bill drawn by the house at New York on the consignees of the cotton at Bremen ; and .§75 20 are charged against defendants as toll on that last transaction, in the shape of “ bill brokerage and commissions of negotiation.” The defendants contend that they are not liable for this last item of expense, inasmuch as they are charged with the nominal amount of the cash advanced and interest on the same; and that any expense in raising the money should be borne by the plaintiff.
The cotton was forwarded from New York to Bremen, and there sold by the consignees, to whom it was committed by Brown & Goldsmith, on the 22d February, 1848, at four months. Commissions, as well as a long list of other charges, are deducted by the consignees from the gross amount of sales; among them are insurance (with a charge for stamps) and commission ■on effecting the same; freight, receiving on board and lighterage, *483 import duty, storing and weighing; on which, (the aggregate being 1186 22 currency at Bremen) is charged interest for 178 days at 5 per cent. To this interest the defendants object. Other items follow, to wit, storage and insurance against fire, labourage, sample drawing, weighing and delivering, brokerage and stamps on notes, commissions, and guaranty on amount sales. To some of these items the defendants object, insisting that, inasmuch as commissions are charged, interest ought not to be, especially on some items on which it has been reckoned. This item of interest in the account of the consignees is equal to about $28 of our currency.
Some of the items in this formidable list may be of novel impression to such as are without the circle of dealing in cotton, and the experience derived from this case might well serve to keep those out who are not versed in the art. To most of us, however, a very full list and an interesting variety of charges are quite familiar, and our known domestic usages in this behalf attest how much of this sort of skill our domestic dealers have attained. Some of the charges in this bill may possibly be comprehensible to a common understanding, upon some consideration. For example, the cotton was sold upon time, notes were probably taken for the price — hence, perhaps, “brokerage and stamps on notes” and “guaranty” joined to the item of commissions; “storing and storage” may be quite distinct matters, the one the service of putting the cotton up, the other the price paid for keeping it under shelter. It seems to have been twice weighed at Bremen — this may have been proper. The first that the right quantity should be forthcoming from the warehouse, and the last necessary upon sale. One item of insurance is general, and is supposed to have been against marine risks; another item of insurance is against fire. About $30 of our currency are charged for “labourage, sample drawing, weighing and delivering.” Some of these words are not familiar to all of us here as usual items of charge. Indeed it may be said that much of the language of commerce is quite unintelligible to the unskilled, and it may be well apprehended that if Lord Coke were *484 to revisit us he would have to begin his studies in this department anew. We observe likewise that witnesses said certain charges were either paid for or supposed to have been, which may serve to remind one of the American notion of mileage and diplomatic expenses of a journey never performed, but supposed to have been. Now how are these and such like points to be determined as matters of law by a Circuit Judge or by this Court ? If the present were a common case of money lent, we should have our laws regulating interest and forbidding usury to guide us, and to these the defendants would fain appeal. If this were a case, domestic in its natnre, of advances of money on account, by a factor, in the current line of business with his customer, we might resort to Smetz vs. Kennedy, (Riley L. C. 218,) where we should learn that “if the usage be clearly established that a factor has a right to charge commissions on goods purchased, and on the amount of his acceptances when he has no funds to meet the payment of drafts at maturity, I think (said Justice Evans) the jury should have allowed these items in the account. But I am satisfied a different rule should prevail in relation to advances. These are, in fact, loans of money; and to charge commissions and interest both, savors of usury, which is unlawful, and no custom or usage can be allowed which repeals the law of the land.” But labor, services, incidental expenses paid for, and interest account, arising from such a shipment of cotton as this was, the charges for negotiating a foreign bill in New York, drawn against the cotton, to meet another drawn on New York, on the same basis, being the steps adopted by the parties to secure the present use (it may be for the original purchase of the cotton,) of a sum of money advanced in anticipation of sales abroad — all these matters must, of necessity, be referred to a jury, to be investigated according to the well established usages in that line of commercial business to which this transaction pertains.
What was done on circuit in this respect does not appear to contravene the rules of law on this subject, which- allow usage to regulate the adjustment of contracts between landlord and *485 tenant, and commercial contracts, provided that no evidence of such usage is receivable inconsistent with the meaning of the contract, as derivable from its express terms, or implication there-. from: and also that “usage of trade” shall be understood to refer-ió a particular usage, to be established by evidence, and distinct from that general custom of merchants which is the universal established law of the land, to be collected from the usual sources of common law, and the knowledge whereof is supposed to reside in the breasts of the Judges. This is certainly a doctrine of modern times, in its full efficacy, as it has originated in the commerce of that period, though it is firmly established, as observed by Justice Buller, in the case to be found 2 T. R. 73. It was properly applied on circuit, so far as the case was committed to the jury.
An interesting question is that which relates to the manner in which the plaintiff introduced his testimony obtained by commission at Bremen. The questions were in English, the answers were in the German language, and they were interpreted to the jury, viva voce, on oath, by Morris Levin. The point of objection is, that a sworn written translation of the answers into English should have been procured by the commissioners, and forwarded as a part of the commission, or at least the plaintiff shorrld have presented such a translation at the trial. Upon general principles it is contended that our law exacts the English tongue as its only language. This is true as to the pleadings : and it is also true that it speaks that language to the jury. But is it true that it hears no other? Every day experience testifies the contrary. Any language is heard in Court where a foreign witness must be used there, and what is the office that the law performs? It requires that means shall be furnished by the actor on the occasion, or in some manner provided, to convert the testimony, clothed and adduced in a foreign tongue,into that which the jury, who are to estimate it, comprehend. It ought to be an unsuspicious medium of interpretation to the jury. It is not unusual that an interpreter, sworn as such, is designated and commissioned by Government, in order to facilitate the intercourse of parties foreign to each other, and unac *486 quainted with the language of each other. Such an interpreter, thus qualified by a general oath, was not considered fit for the .use of commissioners by the courts in Massachusetts; since the dedimus required that the interpreter should be sworn by them for the particular occasion, and he was not. (Vide Amory vs. Fellowes, 5 Mass. R. 219.) But whether the sworn interpreter of evidence in a foreign tongue shall, as the direct medium of translation to a jury, act in presence of the commissioners only, and not in that of the Court upon the trial of the case, does not seem to be a question that goes deeper than to touch considerations of precaution. It may be desirable that, in general, the evidence, in a tongue familiar to the jury, should accompany the commission, because otherwise it may often happen no interpreter can be found, or one only of questionable capacity and fitness. But if none be procured, the party acting will suffer the consequence, since he had as well introduce a mute, with no interpreter ; if an agent of insufficient skill or equivocal behavior, interested or under bias, be produced, the actor will suffer the consequences of that, with the vigilance of his adversary to reinforce their pressure, if not to turn his own weapon against him, by producing a competent person. It is not incongruous in theory, nor is any unusual danger or hardship apprehended in practice, to regard the words in a foreign tongue as standing in Court in lieu of the witness who uttered them, to be treated in the particular of interpretation in manner as a foreign witness, who is present, is, or may be; to wit, to be rendered into English by sworn interpreters — one on either side, if so demanded.
The idea that testimony by deposition is a written document, that should go before the jury as such, seems to present no difficulty ; for in ordinary cases a deposition in English is read to the jury, and reaches them through the ear only, as all evidence derived from the mouth of a witness does.
That a sworn written translation of the species of evidence under consideration should be afforded by the party adducing it, that the adversary may have the facility of scanning narrowly its fidelity to the original, may, in many instances, be a proper *487 measure of precaution, and no more than is due to him who requires it. This the appellant’s counsel thinks he demanded on the trial of this case, and that if granted it would have availed his client. It was not so apprehended by the Circuit Judge, who stated that he did consider his report imperfect in this particular, and would have been well inclined to a motion in that behalf. It is enough to remark that every expedient should be favorably regarded, and that most favorably, the tendency of which gives the strongest promise of an intelligible transmission of the evidence to the jury, through a medium capable, unbi-assed, faithful. In the present instance the report does not lead us into suspicion touching this object. The point has been pressed upon the footing of English practice, and some inquiry has accordingly been made in that direction. It seems that until a late period the litigant at law was obliged to ask a dedi-mus from Chancery to obtain evidence from abroad, nor is it certain that the jurisdiction is yet extinct. That Court had its orders on this subject, and when acting in this behalf is deemed to be ancillary to proceedings at law. When a commission does go, (as we know from 2 Daniel’s Prac. 534,) a direction is usually added to the order, that the commissioners, or some person to be sworn by them, shall interpret the interrogatories to the foreign witness in his language, and his depositions into the English; and keep his knowledge secret. It may be aptly observed here that no such direction is found in our form of commission. The author above named says, at p. 538, “under a commission to examine witnesses who cannot speak English, the usual and proper course is, to take down the depositions from the interpreter in English; (citing Lord Belmore vs. Anderson, 4 Bro. C. C. 90,) this, however, does not appear to be absolutely necessary, since, in some cases, examinations, taken down in a foreign language, have been recognized by the Court. If the depositions are taken down in the language of the witness, they must after-wards be translated out of that language into English, by a person appointed by the Court for such purpose, who must be sworn to the truth of his translation, and must attend at the office for *488 the purpose of making it; for the Court will not make an order for the record of the depositions to be delivered out, in order that they may be translated.”
The translation is annexed to the record, and, by order, a copy may be used at the hearing.
A commission never issues out of the Court of Chancery, but by order of the Court, on affidavit; and its own practice will be observed, though differing from that of the law Courts, and though the object be to aid an action in the latter, (vide Daniel, 489). In relief of Chancery, however, the Courts of law are now empowered by statute, in England, to procure testimony from abroad by commission. The power was first given, circumscribed as to places and cases, in the time of the third George. By 1 William IV, ch. 22, it was made universal. The commission is ordered to examine witnesses on oath, “ by interrogatories or otherwise ; and by the same or any subsequent order or orders,” the Court is to give “ all such directions touching the time, place and manner of such examination, and all other matters and circumstances connected with such examination, as may appear reasonable and just,” (vide Best on Evidence, 107 to 112). It thus appears that the proceedings on Circuit, in relation to the evidence from Bremen, were not in conflict with any rule of the common law, except that rule of its earlier stage that demanded, with a rigid jealousy, viva voce testimony from the witness on the stand, which has been released by force of statute and necessity, so far as to let in the deposition by commissio'n; nor in conflict with a just precaution (in the circumstances of this case) in favor of securing an intelligible and faithful interpretation of the evidence to the jury; nor even in conflict with the practice of the Chancery-in England, acting under its special orders, so far at least as concerns a written translation by the Commissioners ; nor in conflict with any general rules of the law Courts at Westminster, since those Courts can have no rules upon the subject except such as are grafted on the recent special powers given to them by Parliament.
.Since the jury have affirmed that the balance claimed by the *489 plaintiff is the result of an account stated according to the commercial usage applicable to and controlling the transaction between these parties, and as we are not made sensible of any violation of law in the ruling on Circuit upon the question of evidence, it follows that the motion must be refused ; and it is ordered accordingly.
O’Neall, Evans, Ward law, Frost and Whitner, JJ.3 concurred.
Motion refused.